# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| LANDMARK TECHNOLOGY, LLC, a Delaware limited liability company, | § § § | |
| Plaintiffs, | § § § | |
| v. | § § § | Civil Action No.: 2:14-cv-00605 |
| EBAY, INC., a Delaware corporation; SCOTT C. HARRIS, an individual; LAW OFFICE OF SCOTT C. HARRIS, INC., a California corporation, | § § § § § | JURY DEMANDED |
| Defendants. | § § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Landmark Technology, LLC ("Landmark" or "Plaintiff") complains and alleges against Defendants eBay, Inc. ("eBay"), Scott C. Harris ("Harris") and Law Office of Scott C. Harris, Inc. (collectively "Defendants"), as follows:

## INTRODUCTION

1.      Federal law permits requests to be made of the United States Patent and Trademark Office ("USPTO") to commence a form of administrative review, known as an ex parte patent reexamination proceeding, to reexamine the patentability of an issued patent. Just as unscrupulous applicants can harm the public by obtaining a patent through improper conduct and deception before the USPTO (known as "inequitable conduct"), an inventor's marketplace competitors can strategically deprive him of the commercial benefits that his patent rights would otherwise have afforded him by subjecting him to baseless or vexatious reexamination proceedings before the USPTO. Much as in the patent application process, requesters for

reexamination can engage in a correlative "inequitable conduct" by presenting requests premised on frivolous or baseless grounds, or make willful misrepresentations, with the sole motive to deprive the patent owner of the use of his patent. It is well known throughout the intellectual-property community that while a patent is being reviewed before the USPTO during reexamination, the patent owner must endure grave doubts from those in the marketplace regarding his rights. Indeed, courts have recognized that reexamination carries with it "the potential for abuse, whereby unwarranted reexaminations can harass the patentee and waste the patent life."[1] As one Federal Circuit judge recently observed, "[t]he loser in this tactical game of commercial advantage and expensive harassment is the innovator and the public, for it is now notorious that any invention of commercial value is ripe not only for protracted litigation but consecutive reexamination until the patent falls, or the patent or the patentee expires."[2] While the reexamination process serves important purposes in the patent system, "it is not a license to commit intentional torts."[3]

2.      This action arises out of such an instigation of objectively frivolous and baseless reexamination proceedings before the USPTO, which Defendants willfully and knowingly initiated without any reasonable basis in law or fact, by *inter alia*, improperly representing the meaning of certain key terms circumscribing Plaintiff's patent's claims (so as to give the impression to the USPTO that purported "prior art" references created a question of patentability) rather than adopting the well-settled meaning of such terms as evidenced by the specification, explicitly defined by the patentee during prosecution, and as categorically

---

[1] *In re Recreative Techs. Corp.*, 83 F.3d 1394, 1397 (Fed. Cir. 1997).
[2] *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 721 F.3d 1330, 1354 (Fed. Cir. 2013) (Newman, J., dissenting)
[3] *See, e.g., Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1445 (10th Cir. 1992) (intentional interference with protected property interests, intentional interference with prospective business relationships, and unfair competition claims premised on abuse of the ex parte reexamination process).

established in the 9/24/07 NIRC of '625. Knowing that the submitted references could not be considered by the USPTO as sufficient to grant reexamination, Defendants engaged in an objectively baseless representation of key terms, upon which the Examiner relied, and made misrepresentations regarding prior art in violation of federal patent law, for the singular purpose of depriving Plaintiff of the on-going rights required to continue as a business concern and diminishing the value of Plaintiff's assets: two U.S. patents issued to inventor, Lawrence B. Lockwood.

3.      Lawrence B. Lockwood, the managing member and founder of Plaintiff Landmark, is part of a vanishing tradition of small, individual, pioneer inventors in the field of electronic commerce ("e-commerce"), which includes, but is not limited to, mobile commerce, electronic-funds transfer, supply-chain management, transaction processing, inventory-management systems and automated data-collection systems. Working on his own, since 1979, Mr. Lockwood has been granted a dozen U.S. and Canadian patents in the fields of multimedia computer networking, database-search and electronic-commerce technologies. Several of his patents teach cutting-edge, foundational technologies, as demonstrated by the fact that the USPTO has cited the Lockwood patent family as prior art to over 1,667 subsequently issued U.S. patents. In addition, his patents are highly cited by foreign patent offices, such as the European Patent Office and others. Mr. Lockwood's patents are so integral to modern infrastructures that the technologies they encompass are now widely used by larger, better-funded commercial entities.

4.      In 1996 and 2001, the USPTO issued U.S. Patent Nos. 5,576,951 ("Patent '951") and 6,289,319 ("Patent '319") (together the "Patents"), respectively, to Mr. Lockwood. In 2002, to commercialize his property rights, Mr. Lockwood formed PanIP, LLC ("PanIP"), to which he

exclusively licensed his patent portfolio. Thereafter, PanIP successfully licensed the Patents as part of a comprehensive licensing business program. By mid-May 2003, PanIP had entered into licensing relationships with over twenty-five companies, headquartered in fifteen different states.

5. Defendants were aware that these very Patents had been the subject of previous vexatious reexamination proceedings which had interfered with the marketability of the patents and that Landmark's predecessor, PanIP, was financially coerced into abandoning its licensing business to defend the Patents. More than four years after those reexamination proceedings began, and after incurring financially crippling costs defending the validity of the Patents, Mr. Lockwood prevailed completely before the USPTO, with all Patent claims confirmed as patentable (without change) at the conclusion of the reexamination proceedings in July 2007 and January 2008. Unfortunately, as Defendants well knew, having the Patents in reexamination proceedings, PanIP did not fare so well, having been economically depleted by its defense of the Patents during reexamination, and having lost credibility in the marketplace.

6. Having been fully vindicated by the USPTO in the reexamination process, in 2008, Mr. Lockwood sought to re-launch his licensing business. Thus, in 2008, after the expiration of the license to PanIP, on March 10, 2008, Mr. Lockwood formed Landmark and exclusively licensed his patent portfolio to Landmark. Beginning in 2008 and continuing through September 2012, Landmark continued to successfully license the Patents – within the e-commerce market of Defendant eBay, at a steady and upward rate with a commensurate upward trajectory of licensing revenues pursuant to such program, which was, when needed, bolstered by infringement litigation in this judicial district, as well as notification, in-depth expert analysis and presentations to companies using the technologies defined by one or more of the Patents.

7.     Upon Plaintiff's successful licensing of numerous companies in Defendant eBay's ecommerce market, in or about September 2012, Defendants were sufficiently concerned about Plaintiff's position in the marketplace and willfully embarked on a plan to drive Landmark out of business (as had been the case previously in 2003) by filing frivolous and sham requests for reexamination (the "Requests") in order to cause Plaintiff to halt its business and use of the Patents.  Defendant eBay anonymously, and through an outside counsel, Defendant Scott C. Harris, a patent practitioner, concocted the baseless Requests, which were objectively baseless, and presented in a deceptive manner designed solely to get past the low hurdle to instigate the proceedings, knowing that ultimately after a full review, the USPTO would find no basis to challenge or amend the Patents' claims.[4]  Defendants engaged in such deliberate misconduct knowing that, *inter alia* (1) the premise upon which the Requests were based, i.e., that the sole difference between the Patents and the first Lockwood patent (US Patent 4,359,631) was, specifically, the use of "forward chaining," had already fully played out, was settled in the Patents' USPTO file history and was baseless; and (2) none of the documents referenced in its Requests qualified as prior art because they taught away from the inventions and therefore did not raise a substantial new question of patentability such that a reasonable examiner of the USPTO could grant reexamination absent Defendants' sleight of hand.

8.     Simply put, Defendant eBay maliciously instigated the reexamination proceedings for the purpose of interfering with Landmark's efforts to license its Patents to customers of eBay and to evade indemnification obligations eBay claims to have to such customers.  Defendants took such action for the sole purpose of putting Landmark out of business. *See* Amy L. Magas,

---

[4] At the time the Requests were filed, the real party, or party on whose behalf the Requests were filed, was listed as anonymous.  However, in or about June 2013, Plaintiff came to learn that the formally anonymous real party was, in fact, eBay.

Comment, *When Politics Interfere with Patent Reexamination*, 4 J. Marshall Rev. Intell. Prop. L. 160, 182 (2004) (observing that if a "patentee is forced into reexamination, the result is a costly process which can take several years to complete and can result in delays in licensing opportunities").

9.      The Defendants' strategy worked: the USPTO relied on the written Requests as it is required to do [*See Lipman v. Dickinson*, 174 F.3d 1363, 1371 (Fed. Cir. 1999), citing *Kingsland v. Dorsey*, 338 U.S. 318, 319 (1949)], and instituted the reexamination proceedings, which did, in fact, substantially diminish the value of Plaintiff's Patents and irrevocably harmed Landmark's business.  Notably, at the time Defendants filed the Requests, Landmark's licensing revenues were on a steady upward trajectory, but dropped precipitously upon Defendants' initiation of the reexamination proceedings.  In fact, following the filing of the Requests, Plaintiff was advised by a number of potential licensors that they would not license the Patents as a result of the pending reexamination.  Thus, during this period, Plaintiff received *de minimis* licensing income for the Patents.

10.      By the end of the reexamination process in May 2013, Plaintiff was again fully vindicated and the Patents' claims were confirmed in all respects by the USPTO, further exposing the unlawful nature of the Requests.

11.      Nonetheless, the Defendants' conduct had wreaked havoc on Plaintiff's ability to use and benefit from the lawful and valid Patents, and Landmark suffered significant economic damages due to the sham reexamination proceedings by having to expend and divert significant resources (time and money) to recover its key assets (the Patents) and rebuild its credibility in the marketplace rather than continuing its time critical on-going business plan which relied on those assets.  Since the termination of the USPTO's reexamination of Plaintiff's Patents resolved

entirely in Plaintiff's favor, Plaintiff has begun to restart its licensing business and while Landmark has reached valuable licensing agreements on the patented technology with a few companies the effects of the reexamination continue to be felt. However, Defendants' actions caused Plaintiff to lose revenues as a direct result of the sham reexamination process in an approximate amount of not less than $5,000,000.

12.     This suit is brought against Defendants for their wrongful conduct in violation of Texas state law prohibiting abuse of process, intentional and negligent interference with prospective economic relations, malicious prosecution and negligence, by initiating sham reexamination proceedings intended to financially cripple Plaintiff.

<u>PARTIES</u>

13.     Plaintiff Landmark Technology is, and at all times relevant hereto was, a Delaware Limited Liability Company with its principal executive offices located at 719 West Front Street, Suite 157, Tyler, Texas 75702. Lawrence B. Lockwood's patent portfolio, including the Patents at issue, was exclusively licensed to Landmark in 2008. Mr. Lockwood is a California inventor and patent holder who, during the past four decades, has obtained a dozen patents in the fields of multimedia search systems, interactive video computing terminals, as well as electronic commerce and computerized financial services. Mr. Lockwood actively continues to develop and file new applications in the same technology fields. He is the named inventor in, and at all relevant times has been, the owner of U.S. Patent Nos. 5,576,951 and 6,289,319 ("the Patents"). Mr. Lockwood is, and at all times relevant hereto was, the founder and managing member of Landmark, which has staff members in Texas. Landmark also continues to conduct business with law firms, accounting firms and other businesses that it employs. Landmark currently maintains an Internet website with the domain name www.landmarkedi.com.

14.     Plaintiff is informed and believes and thereon alleges that Defendant eBay is, and at all times relevant hereto was, a publicly-held Delaware corporation with its principal executive offices located at 2065 Hamilton Avenue, San Jose, California, 95125, and is doing business throughout the United States, including in Texas.  Defendant eBay was the anonymous party Requestor for both Requests, which was discovered when Defendant eBay filed a substitution of counsel with the USPTO on or about June 4, 2013.

15.     Plaintiff is informed and believes and thereon alleges that Defendant, The Law Office of Scott C. Harris, is, and at all times relevant hereto was, a law firm and a California corporation having its principal place of business located at 13991 Rancho Dorado Bend, San Diego, California 92130.

16.     Plaintiff is informed and believes and thereon alleges that Defendant Scott C. Harris is, and at all times relevant hereto was, a licensed attorney and registered practitioner before the USPTO, who has prosecuted and/or defended numerous claims in the State of Texas and in this district.  Plaintiff is further informed and believes and thereon alleges that during all times relevant to this complaint, Scott C. Harris was a principal, partner or otherwise employed by the Law Office of Scott C. Harris; and was acting within the course and scope of that affiliation with the Law Office of Scott C. Harris with respect to the matters hereinafter alleged.

17.      Defendants Scott C. Harris and the Law Office of Scott C. Harris are hereinafter referred to collectively as the "Harris Defendants."

18.     Plaintiff is informed and believes and thereon alleges that the Harris Defendants and eBay agreed among themselves to use the "Request for Ex Parte Reexamination" to nullify and harm Plaintiff's property interests in the Patents for long enough that Plaintiff would be unable to continue licensing of the Patents.  As practitioners registered to practice before the

USPTO, the Harris Defendants knew and understood that the USPTO relied on the strict duty of candor required of anyone employing the reexamination process, and that any deceptive or misleading statements made in the Requests would be taken at face value and in the decision to grant reexamination under the ethical rules governing USPTO practice.

19.     At all times mentioned herein, each Defendant was the agent of each of the other Defendants, and was acting within the course and scope of said agency.

## JURISDICTION AND VENUE

20.     This case arises under federal patent law pursuant to 28 U.S.C. §1338, and does not include any expressed or implied allegation of patent infringement or any other violation of the U.S. Patent Act.  The business tort claims here are brought under Texas state law for which exclusive federal jurisdiction is nevertheless appropriate because the resolution of the state claims for abuse of process, malicious prosecution, tortious interference with prospective business relations, and negligence necessarily raise substantial issues of federal patent law, *inter alia*, whether there was a valid, good faith assertion of "substantial new question of patentability" [35 U.S.C. § 303(a)]; whether the Defendants' submitted prior art references, properly characterized, meet the standard for reexamination under the patent laws; and, whether a reasonable examiner of the USPTO would have granted reexamination but for Defendants' misconduct and misrepresentations, including misconstructions of pertinent terms circumscribing the Patents' claims which were inconsistent with the specification, and misrepresentation of the Patents' USPTO file and prosecution history denoting the proper definitions. The U.S. Supreme Court has held that federal jurisdiction under Section 1338 extends to, *inter alia*, cases in which the plaintiff's right to relief in a claim otherwise arising under state law "necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary

element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 460 U.S. 800, 808-09 (1988).[5]

21.    Venue is proper in the Eastern District of Texas because Plaintiff Landmark is headquartered in this district; Defendant eBay is registered and doing business in this state and in this district; Plaintiff was harmed in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

22.    This Court has both specific and general personal jurisdiction over each named Defendant because all claims arise from actions occurring within the State of Texas.

<u>FACTS COMMONS TO ALL COUNTS</u>

A.    <u>Background of the Patents</u>

23.    In 1980, Lawrence B. Lockwood filed his first patent application, Self-Service Terminal, which issued as U.S. Patent No. 4,359,631 in 1982.  In 1984, Mr. Lockwood filed his patent application for Automatic Information, Goods and Services Dispensing System that issued

---

[5] While Plaintiff's state law claims depend upon the resolution of substantial questions of federal patent law, it is also Plaintiff's position that the Texas claims are not preempted by federal patent law.  *See, e.g., Allergan, Inc. v. Athena Cosmetics, Inc*., 738 F.3d 1350 (Fed. Cir. 2013) (where claim did not exist "solely by virtue of the FDCA disclosure requirements", then state law implicating traditional tort principles is not preempted) (citing *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 352-53 (2001)); *Hughes v. Boston Scientific Corp.*, 631 F.3d 762 (5th Cir. 2011) (preemption does not apply where violations of federal regulations are offered only as evidence that defendant breached a state law duty); *Bausch v. Stryker Corp.*,630 F.3d 546 (7th Cir. 2010)(preemption does not apply where  state law claims do not require, but are supported by, evidence of violations of federal law); *In re Pharm. Indust. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009) (state claims not preempted where deceptive practices caused harm traditionally protected by state consumer laws, though "the deception touched on a federal agency"); *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85(2d Cir. 2007), affd sub nom. *Warner-Lambert Co. v. Kent*, 552 U.S. 440 (2008) (state law claims not preempted unless fraud on the agency is an actual element of the traditional state claim); *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318 (Fed.Cir.1998), *overruled in part on other grounds by Midwest Industries, Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1360–61 (Fed.Cir.1999) ( *en banc* in part) (holding federal patent law does not preempt state law causes of action alleging bad faith and "sham" proceedings before the USPTO, where state law traditionally regulates business practices, and "as applied" does not conflict with federal patent law); *Dow Chemical Co. v. Exxon Corp.,* 139 F.3d 1470 (Fed.Cir.1998) (holding federal patent law did not preempt state unfair competition claims for intentional interference with contract and prospective contractual relations, each of which relied on proving that the patent was unenforceable because of inequitable conduct before the USPTO).

as U.S. Patent No. 4,567,359 in 1986. That patent was the grandparent patent of the two patents for which Defendants requested ex parte reexamination in September 2012.

24.     Plaintiff's Patent No. 5,576,951 ("Patent '951"), as originally issued by the USPTO, teaches a computer search system for retrieving information using textual and graphical entry paths. The patent also teaches a computerized system for selecting and ordering a variety of information, goods and services. The scope of the invention is defined by its claims and set forth in the publicly-available patent prosecution history.

25.     Plaintiff's Patent No. 6,289,319 ("Patent '319") teaches an automatic data processing system for processing business and financial transactions between entities from remote sites. The scope of the invention is defined by its claims, and set forth in the publicly-available patent prosecution history.

26.     Mr. Lockwood applied for Patent '951 and Patent '319 in 1994, as continuations-in-part of patent application Serial No. 613,525, filed May 24, 1984; the '951 Patent issued in 1996 and the '319 Patent issued in 2001.

27.     In 1999, Mr. Lockwood employed PriceWaterhouse Coopers to conduct a patent licensing analysis of the computer industry to determine the most effective licensing program for the patent portfolio and a valuation thereof. Concurrent with this study, Mr. Lockwood employed the law firm of Luce, Forward, Hamilton and Scripps' intellectual property licensing group to formulate a licensing strategy. When these studies concluded in 2001, Mr. Lockwood was ready to implement PWC and LFHS's professional licensing strategies.

28.      In 2002, Mr. Lockwood formed PanIP, and the Lockwood patent portfolio was exclusively licensed to PanIP. Mr. Lockwood was the managing member of PanIP. PanIP was registered with the California Secretary of State and had several employees in California. PanIP

conducted business with law firms, accounting firms and other businesses that it employed. PanIP had an Internet website and registered its trademark, "PanIP," with the USPTO.

29.     Prior to May 5, 2003, PanIP was successful in reaching over twenty-five agreements to license its patented technology, with companies that conducted electronic commerce and were based in fifteen different states.

30.     After expiration of the license to PanIP, on March 10, 2008, Mr. Lockwood formed Plaintiff Landmark, with its principal place of business in this district, and exclusively licensed his patent portfolio to Landmark. Mr. Lockwood is, and at all times relevant hereto was the managing member of Landmark Technology LLC (Texas Secretary of State filing number 801076890) and it has several staff members in Texas. Landmark also continues to conduct business with law firms, accounting firms and other businesses that it employs in Texas. Landmark currently maintains an Internet website with the domain name www.landmarkedi.com. Beginning in 2008 and continuing through September 2012, Landmark continued to successfully license the Patents pursuant to the Licensing Program, as defined and discussed below.

B.      The Licensing Program

31.     The Patented technologies were being used by many computerized Business-to-Business ("B2B") and Business-to-Consumer ("B2C") systems in the fields of multimedia computer networking, database search and electronic commerce technologies.

32.     In the Spring of 2002, after the assistance of accounting and legal professionals, and at a substantial expense, Mr. Lockwood implemented a patent licensing program through PanIP, whereby companies using the technologies defined by one, or the other, or both of the Patents, were offered a license for a reasonable fee (the "Licensing Program"). The Licensing

Program was initially successful and by mid-May 2003, PanIP had entered into licensing relationships with over twenty-five companies, headquartered in fifteen different states.

C.    Prior Unsuccessful Efforts to Invalidate the Patents

33.    In or about May 2003, the Patents were the subject of two sham petitions for reexamination that were intended to, and did, exact extreme financial harm due to the negative impact on the perceived value and validity of the Patents in the marketplace of electronic commerce competitors.[6]

34.    More than four years after those reexamination proceedings began, and after incurring financially crippling costs defending the validity of the Patents, Mr. Lockwood prevailed completely before the USPTO.  On July 17, 2007, the USPTO issued Ex Parte Reexamination Certificate U.S. 6,289,319 C1, confirming all claims.  Thereafter, on January 29, 2008, the USPTO issued Ex Parte Reexamination Certificate US 5,576,951 C1, confirming all claims.

---

[6] In 2007, Mr. Lockwood brought suit against the filers of the sham reexamination requests, in which he alleged economic harm similar to this case – a fact that Defendants here well knew, and hoped that the same economic harm would ensue against Landmark.  After approximately three years in state and federal court, without having ever reached the merits of the claims, the suit was dismissed by a federal district court in California on numerous alternative state and federal law grounds, including California statutes of limitations, California litigation privilege, California "independent investigation" doctrine, and federal preemption, and failure to state a claim under the Racketeering Influenced Corrupt Organizations ("RICO") statute.  *Lockwood v. Sheppard, Mullin, Richter & Hampton, LLP*, 2009 U.S. Dist. LEXIS 133046 (C.D. Cal. Nov. 24, 2009).  While the Federal Circuit Court of Appeals affirmed that dismissal, it did not specify that the affirmance was on the state grounds, such as statutes of limitations or on federal patent law preemption grounds, but rather affirmed under Fed. Cir. R. 36, which gives the decision no precedential effect. Since that time, the Federal Circuit has addressed the issue raised in the earlier case, the so-called "*Buckman* preemption" of state law claims for misconduct before a federal agency, in a precedential opinion, holding that state law claims "implicat[ing] an historic state power that may be vindicated under state law tort principles" are not preempted by federal law.  *See, Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1355 (Fed. Cir. 2013).  Thus, this case is properly brought under state law, with which there is no conflict by federal patent law.

D.    Defendants' Scheme to Abuse the Patent Process Through the Filing of Frivolous Requests for Reexamination

35.    Knowing the financial impact that the 2003 reexamination proceedings had on Mr. Lockwood, including the crippling effect such proceedings had on Mr. Lockwood's ability to license or sell his property rights in the Patents, Defendants agreed among themselves to use the ex parte reexamination procedure with the sole aim to further harm and nullify Plaintiff's property interests in the Patents and to prevent Plaintiff from being able to benefit from the Patents during a key period of extreme market growth in electronic commerce.  As practitioners registered to practice before the USPTO, the Harris Defendants knew and understood that the USPTO relied on the required strict duty of candor for all patent practitioners during the review of the ex parte request, and knew that, in deciding whether to initiate reexamination, the USPTO would rely on and assume Defendants' assertions regarding the definition of key terms circumscribing the claims, such as "forward chaining" (and the Requestor's familiarity with the public record of the Patents' prosecution history), "prior art", "obviousness" and "substantial new question of patentability" made in the Requests were warranted, had evidentiary support, and were not being presented for any improper purpose, such as to harass or harm Plaintiff.  *See* 35 U.S.C. §§ 103(a), 302, and 303(a); 37 C.F.R. § 11.18.

36.    In furtherance of the agreement to enter into a scheme to intentionally abuse the patent process established by Congress and administered by the USPTO, Defendants signed the Requests and submitted the Requests to the USPTO on or about September 14 and 15, 2012.

37.    In connection with the Requests, Defendants attempted to locate examples of early electronic sales systems in order to demonstrate that the Patents had been improvidently granted by the USPTO.  Defendants, however, were unable to find any prior art to invalidate the Patents.  Nevertheless, Defendants proceeded with the filing of the Requests, by re-wording

purported prior art references and re-defining the Patents' claims without any objective basis for doing so, given the specification and available USPTO file history.

38. Specifically, and by way of example, the Requests stated: "Lockwood in combination with Dungan [Shortliffe] [Johnson] teaches all limitations of claims 1-32, including the element repeatedly urged by applicant during prosecution as being the key feature that distinguished over Lockwood." *See* '951 Request at p. 24. However, a mere cursory review of the Patents' prosecution history, specification and actual Patents' claims' would have revealed what the USPTO ultimately found: that the Defendants' submitted prior art actually taught away from the Patents' claims, and would not have raised any new question of patentability, had the Defendants truthfully set forth the Patents' claims' definitions. In furtherance of their scheme, Defendants misrepresented the Patents' prosecution file in making such assertions regarding the definitional meaning of the claims' terms, and distorted the meaning of the claims with reference to the state of the prior art. *See* '951 Notice of Intent to Issue an Ex Parte Reexamination Certificate at 31-32. For example, Defendants misrepresented to the USPTO that "[t]hroughout the prosecution of the '951 patent, the Examiner consistently found that virtually all of the elements of the original patent claims were disclosed in Lockwood," i.e., the first Lockwood patent; yet, as the USPTO noted, citing parts of the record demonstrating the falsity of Defendants' statement, the actual prosecution history revealed otherwise. *See* '951 Notice of Intent to Issue an Ex Parte Reexamination Certificate at 31-32.

39. By misrepresenting the prosecution histories of the Patents in defining key terms circumscribing the claims, and rewriting the terms to create a basis for prior art, Defendants were then able to submit otherwise irrelevant and unrelated references that used the very same language concocted by the Defendants. Specifically, the term "forward-chaining", that appeared

in the referenced "prior art" would not have been deemed relevant to patentability if the Defendants had truthfully set forth the meaning of the claim terms in a manner that was consistent with the specification and the prosecution history, as a reasonable patent practitioner is required to do.

40.     Moreover, the Defendants well knew that a reasonable examiner would  routinely rely on Defendants' erroneous statements regarding the definitional meaning of the claims' terms , and Defendants' comparison to otherwise irrelevant submitted "prior art", prior to the grant of reexamination, and such misrepresentations would function as a basis for raising a "substantial new question of patentability"  where otherwise, none would exist.  *See* 37 C.F.R. § 1.510(b)(1).

41.     Defendants' misrepresentations regarding the Patents' claims and baseless assertions regarding the purported prior art references were the reason for the grant of reexamination.   Indeed, upon the Examiner's full review of the Requests' assertions, the Examiner held that they were without merit and were contrary to the Patents' specification and prosecution history, though the claims' definitions were required to be in accord with them.  *See* 37 § C.F.R. 1.510(a).

42.     But for such misrepresentations, the Reexamination of the patents would not have been instituted, and Plaintiff would not have suffered harm.

43.     Part of the integrity of the USPTO process is the requirement that attorneys practicing before the Office only make statements based on a very stringent duty of candor.  This strict duty of candor is set forth in 37 C.F.R. § 11.18, 37 C.F.R. § 1.555 and 37 C.F.R. §10.23, among other places.   In short, when an attorney makes a statement or files a paper with the USPTO, the Office relies on the fact that such statement must be true and can be relied on as true and accurate.  *See Lipman v. Dickinson*, *supra,* 174 F.3d 1363, 1371 (Fed. Cir. 1999), citing

*Kingsland v. Dorsey*, 338 U.S. 318, 319 (1949). Certain regulations apply not only to members of the patent bar but to anyone submitting papers before the USPTO. *See, e.g.,* 37 C.F.R. § 11.18 (setting forth standards applying to parties presenting papers to the Office "whether [that party is] a practitioner or non-practitioner"); 35 U.S.C. § 301 (permitting "any person at any time" to cite prior art to the USPTO "which that person *believes* to have a bearing on the patentability of any claim of a particular patent") (emphasis added).

44. Fully aware of these requirements under the patent bar standards, Defendants improperly filed the Requests knowing there was no valid basis in fact or law for such reexaminations. Defendants knew they had no probable cause to challenge the validity of the Patents, based on their own failure to locate any relevant prior art. Defendants failed to rely on the prosecution histories of the Patents in defining key terms in the Patents' means plus function claims, and erroneously cited to and made misleading statements regarding the supposed prior art which did not invalidate the Patents under any objective standard. Defendants took such actions for the sole purpose of abusing the patent process and harming Plaintiff. Defendants knew that it is the duty of a patent attorney to submit only legitimate and relevant material, and to avoid obfuscation and misdirection. One reason this duty is so crucial is that the reexamination process can be very time-consuming for both the USPTO and the inventor and during that time, valid property rights can be rendered worthless. Without a strict duty of candor, not only would the USPTO be crippled but also inventors would be vulnerable to reexamination proceedings brought for the purpose of harassment, and to deny them their rights.

45. Defendants knew that under the USPTO rules, and pursuant to standard practice and procedure, Plaintiff could not, and would not, challenge Defendants' Requests or take any official action with the USPTO until after the USPTO made its determination whether to grant or

deny the Requests.[7]  Defendants knew also that once a reexamination request was granted by the USPTO, it could take months, if not years, to complete the process, and that during this time, the Patents would be under a cloud of unenforceability with virtually no way for Plaintiff to license or otherwise lawfully benefit from them; and that the value of such patents is severely limited due to the pendency of reexamination proceedings.   Defendants knew that the USPTO presumes that requests to institute reexamination proceedings of the Patents, even if in fact based on frivolous or deceptive means, are done honestly and in good faith, and that such a reexamination would have the practical effect of placing Plaintiff's licensing business on hold, and might have caused it to end altogether, thereby damaging the Patents and Plaintiff.

46.     In the Requests, the Harris Defendants (the named requestor) in utter disregard and violation of their strict duty of candor and duty to investigate factual and legal allegations submitted before the USPTO pursuant to federal law and professional codes of ethics, intentionally failed to rely on specification and the prosecution histories of the Patents in defining key terms circumscribing the claims of the Patents, and made erroneous and misleading statements characterizing references as alleged "prior art" that Defendants asserted raised a substantial new question as to patentability of the Patents.  Defendants knew that, in fact, there was no legitimate prior art.

47.     Defendants knew the USPTO would rely on the duty of candor requiring them to provide only truthful statements or conclusions about prior art references submitted in

_____

[7]  In ex parte reexamination, the patent owner is not permitted a response prior to the USPTO's decision to grant the request.  *See* 37 C.F.R. § 1.530(a).  Even after the USPTO has granted the request and initiated reexamination, standard practice is to forego the filing of an optional patent owner's statement before the USTPO has filed a first office action on the merits, because to file such a statement triggers the third-party requester's right to respond.  *See* 37 C.F.R. § 1.550(g); *See also* Roger Shang and Yar Chaikovsky, *Inter Partes Reexamination of Patents: An Empirical Evaluation*, 15 Tex. Intell. Prop. L.J. 1, 5 (2006) ("A smart patent owner…would normally forego the filing of the statement to prevent the third party response.").

reexamination requests. Defendants knew the USPTO routinely grants reexamination for approximately 95% of the requests submitted if such requests appear to meet the form and substance of a request raising a substantial new question of patentability, including multiple prior art references, detailed claim charts, extensive analysis of the claims and of how the prior art reads on such claims. In order to persuade the USPTO to decide that "a substantial new question of patentability" was present, and knowing the level of acceptability the USPTO required, Defendants erroneously and/or improperly cited to, mischaracterized and made reference to pages that did not exist in order to give the impression, though false, of the existence of relevant prior art.

48.     Defendants knew that the USPTO has a PTOL-2077 form that lists eight items, each of which a request must meet. For example, the fourth item requires, "A statement pointing out each substantial new question of patentability based on the cited patents & printed publications, and a detailed explanation of the pertinence and manner of applying the patents and printed publications to every claim for which reexamination is requested." Defendants knew and agreed among themselves to make erroneous and misleading representations about claimed prior art for the purpose of having the Requests granted.

49.     Defendants knew that in order to succeed in their scheme to injure Plaintiff's property rights and to persuade the USPTO to grant the Requests, they had to avoid a rejection of "A Notice of Failure to Comply", PTOL-2077, which requires: "The requester should quote each pertinent teaching in the prior art reference, referencing each quote by page, column and line number, and any relevant figure numbers." Defendants knew that the purported prior art references they had located did not qualify nor meet these requirements, so they fabricated the Patents' claims' scope without regard for the publicly available USPTO history, misquoted

numerous statements about pages, columns, and line numbers with complex claim charts allegedly identifying prior art references. Defendants thereby improvidently gave the appearance of invalidating each claim of the Patents, in order to persuade the USPTO to grant reexamination, for the purpose of depriving Plaintiff of property rights to use the Patents, to which Plaintiff was entitled for seventeen years. *See* 35 U.S.C. § 154(c).

E.   Examples of Baseless Assertions and Willful Mischaracterizations of "Prior Art" Advanced by Defendants in the Requests for Reexamination of the '319 and '951 Patents

50.   Dungan Reference:   In support of their Requests to the USPTO, Defendants incorrectly and improperly misrepresented that an expert system entitled "Auditor: a microcomputer-based expert system to support auditors in the field" filed by Chris W. Dungan, and published in November 1983 ("Dungan"), described prior art pursuant to 35 U.S.C. § 102. However, a careful analysis and review of Defendants' cited references to Dungan reveal that Dungan, in fact, blatantly contradicts Defendants' arguments as to prior art. In particular, Defendants claimed that the term "forward chaining," as used in Dungan, taught a process for processing data that was identical to the "forward chaining" referenced in the prosecution histories of the Lockwood Patents. Specifically, the Requests stated: "Lockwood in combination with Dungan teaches all limitations of claims 1-32, including the element repeatedly urged by applicant during prosecution as being the key feature that distinguished over Lockwood. *See* '951 Request at 24; '319; Request at 25. However, a cursory review of the Patents' prosecution histories reveals to any reasonable patent practitioner that the term "forward chaining" as used in the prior art is inconsistent with the specification and not the same term as characterized by the prosecution histories of the Patents. In fact, as the Examiner noted in her '951 Notice of Intent to Issue Ex Parte Reexamination Certificate at page 31: "Therefore, even if the teachings of Dungan, Shortliffe and/or Johnson, see discussion infra, did provide the deficiencies of

Lockwood, such disclosures teach away from the Request's uncollaborated [sic] conclusions that the forward chaining techniques in an auditing domain of Dungan, a cancer diagnosis domain of Shortliffe, a locomotive trouble-shooting domain of Johnson, alone or, as best understood, as a group, in combination with the backward-chaining techniques of a travel domain of Lockwood '631 would have been considered obvious as yielding a predictable result requiring only mere software changes and thereby contemplated by Lockwood in col. 8, lines 39-50." *See* '951 Notice of Intent to Issue an Ex Parte Reexamination Certificate at 31.

51.     Here, the Defendant requestor intentionally reframed the definition of "forward chaining" so as to compare similar terms found in the Dungan Reference, thereby giving the appearance to the USPTO that the reference was indeed prior art, when it was not.  Had the Defendants adopted the meaning of "forward chaining" consistent with the specification and prosecution histories of the Patents, there would have been no arguable assertion that the Dungan reference could be considered prior art for purposes of establishing a substantial new question of patentability.

52.     It was these misrepresentations that the USPTO found meritless at the close of reexamination, and that were the basis of the grant of reexamination proceedings, which lasted months and which caused a severe economic harm to Plaintiff's licensing of the Patents.

53.     Had the Requestor relied on the actual definition of the Patents' key terms, consistent with the specification and as provided in the Patents' prosecution history, then the Dungan reference would have no bearing as potential "prior art", nor on its face would the Requests have been considered to have raised a "substantial new question of patentability," and the Requests would have been denied.

54.     Further, in support of their Requests to the USPTO, Defendants also cited to and relied on purported references to Dungan which were nowhere to be found in the published work.  Indeed, some of the referenced passages upon which Defendants relied actually came from a work by the same author – that was not published until October 1985 (almost two years after the date represented by the requester).  Given the Patents' application dates, Dungan as quoted thus could not have qualified as prior art under 35 U.S.C. § 102.  Defendants knew that their reliance on Dungan was baseless and improper and that their citation to Dungan's later work was misleading.  As such, Defendants knew that they did not have a valid and proper factual basis to make such representations in the reexamination requests.

55.     Shortliffe Reference: In addition, Defendants made erroneous statements of fact and baseless assertions in regard to what was supposedly shown in prior art reference "An Expert System for Oncology Protocol Management" filed by Edward H. Shortliffe and published in August 1981 ("Shortliffe").  In particular, Defendants similarly claimed that the term "forward chaining," as used in Shortliffe, taught a process for processing data that was consistent with the specification and identical to the "forward chaining" referenced in the prosecution histories of the Lockwood Patents.  Specifically, the Requests stated: "Lockwood ['631] in combination with Shortliffe teaches all limitations of claims 1-32, including the element repeatedly urged by applicant during prosecution as being the key feature that distinguished over Lockwood.  *See* '951 Request at 26; '319 Request at 25.  However, a cursory review of the Patents' prosecution histories reveals to any reasonable patent practitioner that the term "forward chaining" is not the same term as characterized therein.  In fact, as the Examiner noted in her '951 Notice of Intent to Issue Ex Parte Reexamination Certificate at page 31: "Therefore, even if the teachings of Dungan, Shortliffe and/or Johnson, see discussion infra, did provide the deficiencies of

Lockwood ['631], such disclosures teach away from the Request's uncollaborated [sic] conclusions that the forward chaining techniques in an auditing domain of Dungan, a cancer diagnosis domain of Shortliffe, a locomotive trouble-shooting domain of Johnson, alone or, as best understood, as a group, in combination with the backward-chaining techniques of a travel domain of Lockwood '631 would have been considered obvious as yielding a predictable result requiring only mere software changes and thereby contemplated by Lockwood in col. 8, lines 39-50." *See* '951 Notice of Intent to Issue Ex Parte Reexamination Certificate at page at 31.

56.    Here, the Defendant requestor intentionally reframed the definition of "forward chaining" so as to compare similar terms found in the Shortliffe Reference, thereby giving the appearance to the USPTO that the reference was indeed prior art, when it was not. Had the Defendants adopted the meaning of "forward chaining" consistent with the specification and prosecution histories of the Patents, there would have been no arguable assertion that the Shortliffe reference could be considered prior art for purposes of establishing a substantial new question of patentability.

57.    It was these misrepresentations that the USPTO found meritless at the close of reexamination, and that were the basis of the grant of reexamination proceedings, and which caused a severe economic harm to Plaintiff's licensing of the Patents.

58.    Had the Requestor relied on the actual definition of the Patents' key terms, as consistent with the specification and as provided in the Patents' prosecution history, then the Shortliffe reference would have no bearing as potential "prior art", nor on its face would the Requests have been considered to have raised a "substantial new question of patentability," and the Requests would have been denied.

59.     Moreover, Defendants' citation to Shortliffe was on its face incorrect, as Defendant completely mischaracterized the referenced elements in such prior art.  For example, as recognized by the USPTO in its order refuting the Defendants' representations (Notice of Intent to Issue Ex Parte Reexamination Certificate) , "Shortliffe only teaches, a specialized/custom terminal interface (hardware and software) for entering responses/inquiries to a simulated flowsheet window, i.e. graphical information, via a keyboard of a computer terminal/video screen which responses, if relevant, are passed to the Reasoner which simultaneously employs task performing control blocks including backward-chaining and forward-chaining sequences . . .  Shortliffe does not teach, e.g., 'automatic data processing means for executing inquiries provided by a user in order to search said textual information and graphical information through said selected entry path means and for fetching data as a function of other data' . . . nor does it teach 'means, responsive to said means for processing, for executing inquiries provided by said user and for searching said textual and graphical information through said selected entry path means'" as claimed by Defendants in the Requests. *See* 951' Notice of Intent to Issue Ex Parte Reexamination Certificate at 35.  Moreover, in the Requests, Defendants made strategic edits and omissions to the referenced passage from Shortliffe for the purpose of presenting elements that were not actually present in this prior art reference.  For example, on Page 27 of Defendants' Request for Ex Parte Reexamination of Patent '951, Defendants cite to a passage from Shortliffe that purportedly discloses an expert system called Oncocin developed to assist clinical oncologists in the treatment of cancer patients. However, a review of Shortliffe reveals that this passage has been strategically edited to, *inter alia,* mask the fact that the user and the data are disconnected and that this expert system is being performed after the fact, i.e. after examination of the patient.

60. <u>Johnson Reference</u>: Finally, in support of their Requests, Defendants referenced "Expert System for Diesel Electric Locomotive Repair" filed by Harold E. Johnson and published in September 1983 ("Johnson"). However, like Dungan and Shortliffe above, Defendants claimed that the term "forward chaining," as used in Johnson, taught a process for processing data that was consistent with the specification and identical to the "forward chaining" referenced in the prosecution histories of the Lockwood Patents. Specifically, the Requests stated: "Lockwood ['631] in combination with Johnson teaches all limitations of claims 1-32, including the element repeatedly urged by applicant during prosecution as being the key feature that distinguished over Lockwood. *See* '951 Request at 29; '319 Request at 28. However, a cursory review of the Patents' prosecution histories reveals to any reasonable patent practitioner that the term "forward chaining" is not the same term as characterized therein. In fact, as the Examiner noted in her '951 Notice of Intent to Issue Ex Parte Reexamination Certificate at page 31: "Therefore, even if the teachings of Dungan, Shortliffe and/or Johnson, see discussion infra, did provide the deficiencies of Lockwood ['631], such disclosures teach away from the Request's uncollaborated [sic] conclusions that the forward chaining techniques in an auditing domain of Dungan, a cancer diagnosis domain of Shortliffe, a locomotive trouble-shooting domain of Johnson, alone or, as best understood, as a group, in combination with the backward-chaining techniques of a travel domain of Lockwood '631 would have been considered obvious as yielding a predictable result requiring only mere software changes and thereby contemplated by Lockwood in col. 8, lines 39-50." *See* '951 Notice of Intent to Issue Ex Parte Reexamination Certificate at page 31.

61. Here, the Defendant requestor intentionally reframed the definition of "forward chaining" so as to compare similar terms found in the Johnson Reference, thereby giving the

appearance to the USPTO that the reference was indeed prior art, when it was not. Had the Defendants adopted the meaning of "forward chaining" consistent with the specification and prosecution histories of the Patents, there would have been no arguable assertion that the Johnson reference could be considered prior art for purposes of establishing a substantial new question of patentability.

62. It was these misrepresentations that the USPTO found meritless at the close of reexamination, however, it was these misrepresentations that were the basis of the grant of reexamination proceedings, which lasted months and which caused a severe economic harm to Plaintiff's licensing of the Patents.

63. Had the Requestor relied on the actual definition of the Patents' key terms, as consistent with the specification and as provided in the Patents' prosecution history, then the Johnson reference would have no bearing as potential "prior art", nor on its face would the Requests have been considered to have raised a "substantial new question of patentability," and the Requests would have been denied.

64. Further, as the USPTO recognized in its order refuting the Defendants' representations (Notice of Intent to Issue Ex Parte Reexamination Certificate), Johnson did not provide the teachings as claimed by Defendants in their Requests: "Johnson does not teach 'means, responsive to said means for processing, for executing inquiries provided by said user and for searching said textual and graphical information through said selected entry path means' (which limitation refers back to 'means for interrelating said textual and graphical information; a plurality of entry path means for searching said stored interrelated textual and graphical information') as claimed in claim 10. Furthermore, see, e.g., Johnson at Abstract, Problem and Proposed Solution section and Conclusion, esp. 'field prototype', 'rugged unit', 'small micro-

based systems', i.e. Johnson is not, e.g., a station in bi-directional data communication with a computerized installation, i.e. does not teach such means comprising 'at least one computerized station' which is in addition to 'a plurality of computerized data processing installations programmed for processing order for information, goods, and services' and thereby, such station's 'said means for executing and searching, including means for addressing at least one of said installations and for retrieving data related to said answer'." *See* '951 Notice of Intent to Issue Ex Parte Reexamination Certificate at 37.

65.     Defendants' actions, as described above, were made with the specific purpose that the USPTO would rely on them to initiate the reexamination of the Patents. Defendants knew that, but for their making such baseless, erroneous and misleading statements and assertions, that there was no reasonable basis that a substantial new question of patentability presented. Defendants knew that the USPTO ultimately would confirm the Patents' claims, yet intentionally made the Requests to vex Plaintiff and to derail its licensing program.

66.     Knowing that the USPTO would rely on the Defendants' strict duty of candor, Defendants also knew that the USPTO would rely on whatever factual statements and assertions were made by them in the Requests. Defendants knew as practitioners in the area of patent law, that approximately 95% of requests for reexamination are granted and that the practical effect of the reexamination proceeding is to cast a cloud on a patent's validity and so virtually preclude the patent holder from reaping commercial benefit from the use, sale or licensing of his patents. Defendants also knew that the practical effect of granting the Requests would be that such cloud would linger over the Patents for the duration of the reexamination, which could extend to four years or longer. Defendants had no reasonable good faith belief that there was in fact any substantial new question of patentability or that the reexamination proceedings would ultimately

resolve in Defendants' favor. Defendants submitted their two Requests for reexamination for the purpose of causing Plaintiff economic harm by delaying and disrupting Plaintiff's Licensing Program and potentially driving it out of business, regardless of the veracity of the statements made to the USPTO to begin proceedings or their ultimate resolution.

F.      The USPTO Again Vindicates All Claims of Lockwood's '951 & '319 Patents

67.      Over eight months after the reexamination proceedings instigated by Defendants began on September 2012, these proceedings were resolved completely in Plaintiff's favor. The USPTO reconfirmed the patentability of the inventions disclosed and claimed therein, without any change, thus effectively confirming that none of the Defendants' representations in their Requests about the validity of the inventions disclosed and claimed in the Patents were accurate or constituted bases for probable cause to create a substantial new question of patentability.

68.      On January 9, 2013, the USPTO issued Ex Parte Reexamination Certificate U.S. 6,289,319 C2, confirming all claims.

69.      On May 9, 2013 the USPTO issued Ex Parte Reexamination Certificate US 5,576,951 C2, confirming all claims.

70.      Indeed, recognizing the erroneous and deceptive representations in the Requests, the USPTO examiner stated at Page 38 of the '951 Notice of Intent to Issue Ex Parte Reexamination Certificate that Defendants' Request for Reexamination "cites pages" of prior art "which *do not exist*." (emphasis added). Moreover, at Page 31 of the Notice, the USPTO decision stated:

> "Therefore, even if the teachings of Dungan, Shortliffe and/or Johnson, see discussion infra, did provide the deficiencies of Lockwood, ***such disclosures teach away from the Request's uncollaborated [sic] conclusions*** that the forward chaining techniques in an

auditing domain of Dungan, a cancer diagnosis domain of Shortliffe, a locomotive trouble-shooting domain of Johnson, alone or, as best understood, as a group, in combination with the backward-chaining techniques of a travel domain of Lockwood '631 would have been considered obvious as yielding a predictable result requiring only mere software changes and thereby contemplated by Lockwood in col. 8, lines 39-50, i.e. . ."

(Emphasis added).

71.     Due to Defendants' misconduct and due to their deceptive instigation of USPTO proceedings, from the time of the submission of the Requests, Defendants' violations were continuing, as was the injury to Plaintiff.  Plaintiff did not know and had no reason to know the full extent of the wrongful nature of Defendants' conduct before expending extensive time and effort in the reexamination proceedings.  Plaintiff, like the USPTO, initially relied on the Defendants' duty of candor, and due to the misleading nature of the Requests, Plaintiff was prevented from discovering or realizing the full extent of Defendants' abuse and misuse of the reexamination proceedings for improper purposes until after the reexaminations were initiated.

FIRST CAUSE OF ACTION

Abuse of Process

(Against All Defendants)

72.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 71 above.

73.     Defendants made an illegal, improper, or perverted use of process before the USPTO in submitting erroneous and misleading Requests for reexamination of Plaintiff's Patents in violation of federal law, a use neither warranted nor authorized by the process.  Defendants

had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the reexamination process; and Plaintiff suffered damage as a result of Defendants' illegal conduct.

74.     Among other things, Defendants knowingly failed to define key terms of the Patents' means-plus-function claims, such as "automatic data processing means", in a manner consistent with the specification and the prosecution histories of the patents, and engaged in objectively baseless claim construction upon which the Examiner relied, submitting re-worded and misquoted references to documents which Defendants understood would not, and could not, be properly characterized as "prior art" under the standard for instigating reexamination under the patent laws.    Further, the Defendants misrepresented the prosecution history of the challenged Patents, and deliberately altered what was shown in other prior art references, including misquoting the referenced documents, for the sole purpose of convincing the USPTO to initiate reexamination of the Patents.    Defendants knew that their representations regarding, for example, the meaning of the claims and prior art, were incorrect or misleading, and without Defendants' misrepresentations the USPTO would not have initiated reexamination of Plaintiff's Patents.    At the end of the reexamination process, the USPTO necessarily determined that Defendants' representations regarding among other things, the meaning of the claims and the contents of the prior art, were without merit and false in that these references submitted by Defendants did not disclose, teach or suggest the patented inventions.    Rather, the USPTO determined that they "teach away" from the patented inventions.    *See* '951 Notice of Intent to Issue Ex Parte Reexamination Certificate at 31.

75.     Defendants acted primarily for a purpose other than succeeding on the merits of the claim, i.e., for the purpose of influencing the USPTO to engage in sham reexaminations

based on the Requests in order to injure Plaintiff by derailing the successful licensing of the Patents and for the purpose of causing economic harm to Plaintiff in the marketplace.

76.     But for Defendants' deceptive Requests before the USPTO that violated their duty of candor and duty to investigate, reexamination would not have been granted, thereby placing a cloud upon Plaintiff's right to the use of the Patents, requiring Plaintiff to expend exorbitant amounts of money and time to defend the Patents during the reexamination process.

77.     Defendants' conduct proximately caused serious financial harm to Plaintiff including, but not limited to, the loss of the use of the Patents, including through its licensing program, the loss of business reputation, and collateral economic harm associated with the loss of the use of property rights, as well as expenses and attorney's fees and costs incurred. Defendants' conduct was willful, malicious, fraudulent and oppressive, justifying an award of punitive damages.

78.     Defendants intended to disrupt these licensing relationships by maliciously and in bad faith instigating sham reexamination proceedings before the USPTO for the purpose of derailing Plaintiff's licensing efforts through the use of deception and wrongful conduct in violation of Texas state law and rules of professional ethics.

SECOND CAUSE OF ACTION

Malicious Prosecution

(Against All Defendants)

79.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 78 above.

80.     Defendants wrongfully used the reexamination proceedings before the USPTO in submitting erroneous and misleading Requests for reexamination of Plaintiff's Patents in

violation of federal law by engaging in conduct involving dishonesty or misrepresentation and engaging in conduct that is prejudicial to the administration of justice. *See, e.g.*, 37 C.F.R.§ 11.18; 1.555; §10.23 (b).

81.     Among other things, Defendants knowingly failed to rely on the prosecution histories of the Patents in defining key terms of the Patents' means-plus-function claims, such as "automatic data processing means", and engaged in objectively baseless claim construction upon which the Examiner relied, submitted re-worded and misquoted references to documents which Defendants understood would not, and could not, be properly characterized as "prior art" under the standard for instigating reexamination under the patent laws.  Further, the Defendants misrepresented the prosecution history of the challenged Patents, and deliberately altered what was shown in other prior art references, including misquoting the referenced documents, for the sole purpose of convincing the USPTO to initiate reexamination of the Patents.  Defendants knew that their representations regarding, for example, the claims construction and prior art, were incorrect or misleading, and without Defendants' misrepresentations the USPTO would not have initiated a reexamination of Plaintiff's Patents.  At the end of the reexamination process, the USPTO necessarily determined that Defendants' representations regarding among other things, the claims construction and prior art, were without probable cause and false in that these references submitted by Defendants did not disclose, teach or suggest the patented inventions.

82.     The reexamination proceedings resolved in Plaintiff's favor when all claims of the Patents were confirmed in their entirety by the USPTO on January 9, 2013 and on May 9, 2013.

83.     Defendants submitted the Requests without probable cause in that no reasonable attorney would have found the Requests legally tenable under the patent laws after prudent investigation of the alleged pieces of prior art and the law governing patent reexamination.

84.     Defendants acted primarily for a purpose other than succeeding on the merits of the claim, i.e., for the purpose of influencing the USPTO to engage in sham reexaminations based on the Requests in order to injure Plaintiff by derailing the successful licensing of the Patents and for the purpose of causing economic harm to Plaintiff.

85.     But for Defendants' deceptive Requests before the USPTO that violated their duty of candor and duty to investigate, reexamination would not have been granted, thereby placing a cloud upon Plaintiff's right to the use of the Patents, requiring Plaintiff to expend exorbitant amounts of money and time during the reexamination process.

86.     Defendants' conduct proximately caused serious financial harm to Plaintiff including, but not limited to, the loss of the use of the Patents, including through its licensing program, the loss of business reputation, and collateral economic harm associated with the loss of the use of property rights, as well as expenses and attorney's fees and costs incurred. Defendants' conduct was willful, malicious, fraudulent and oppressive, justifying an award of punitive damages.

87.     Defendants intended to disrupt these licensing relationships by maliciously and in bad faith instigating sham reexamination proceedings before the USPTO for the purpose of derailing Plaintiff's licensing efforts through the use of deception and wrongful conduct in violation of Texas state law and rules of professional ethics.

## THIRD CAUSE OF ACTION

## Tortious Interference with Prospective Business Relations

### (Against All Defendants)

88.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 87 above.

89.     Defendants' conduct was wrongful, and constituted willful interference with Plaintiff's economic and prospective business relationships in that Defendants knew that Plaintiff's licensing program was resulting in licenses from business/licensors that were using Plaintiff's patented technologies.

90.     When Defendants filed the Requests, they were aware of the business relationships that Plaintiff had and reasonably expected to obtain.

91.     Defendants were also aware that if the Requests were successful in causing the USPTO to initiate reexamination proceedings, the licensing program would be stopped (as had been the case previously with PanIP) during the pendency of the proceedings, and that Plaintiff would need to expend resources to defend the reexamination, which resources would thus be diverted from and not available for reinstitution of the business.

92.     Defendants intended to disrupt these licensing relationships by maliciously and in bad faith instigating sham reexamination proceedings before the USPTO for the purpose of derailing Plaintiff's licensing efforts through the use of deception and wrongful conduct in violation of Texas state law and rules of professional ethics.

93.     Defendants have proximately caused financial and economic harm to Plaintiff, including but not limited to loss of the use of the valid Patents through licensing relationships, out of pocket expenses related to the licensing program, attorneys' fees and costs, and lost profits from the licensing program which would have continued but for Defendants' wrongful conduct.

94.     Defendants' conduct was willful, malicious, fraudulent and oppressive, justifying an award of punitive damages.

95.     Defendants intended to disrupt these licensing relationships by maliciously and in bad faith instigating sham reexamination proceedings before the USPTO for the purpose of

derailing Plaintiff's licensing efforts through the use of deception and wrongful conduct in violation of Texas state law and rules of professional ethics.

FOURTH CAUSE OF ACTION

Negligent Interference with Prospective Business Relations

(Against All Defendants)

96.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 95 above.

97.     Defendants' conduct was wrongful, and constituted negligent interference with Plaintiff's economic and prospective business relationships in that Defendants knew that Plaintiff's licensing program was resulting in licenses from business/licensors that were using Plaintiff's patented technologies.

98.     Defendants, and each of them, owed Plaintiff a legal duty of care.

99.     When Defendants filed the Requests, they were aware of the business relationships that Plaintiff had and reasonably expected to obtain.

100.     Defendants were also aware that if the Requests were successful in causing the USPTO to initiate reexamination proceedings, the licensing program would be stopped during the pendency of the proceedings, and that Plaintiff would need to expend resources to defend the reexamination, which resources would thus be diverted from and not available for reinstitution of the licensing program, should the Patents emerge intact.

101.     Defendants disrupted these licensing relationships by filing Requests for Reexamination of the Patents that carelessly and negligently contained erroneous statements regarding claims construction, errors, misstatements and technical deficiencies regarding

whether certain documents qualified as prior art, and misrepresented what was shown in other prior art references.

102.     Defendants have proximately caused financial and economic harm to Plaintiff, including but not limited to loss of the use of the valid Patents through licensing relationships, out of pocket expenses related to the licensing program, attorneys' fees and costs, and lost profits from the licensing program which would have continued but for Defendants' wrongful conduct.

## FIFTH CAUSE OF ACTION

### Negligence

### (Against All Defendants)

103.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 102 above.

104.     Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, filed the Requests for Reexamination of the Patents that carelessly and negligently contained errors, misstatements and technical deficiencies regarding whether certain documents qualified as prior art, and misrepresented what was shown in other prior art references.

105.     Defendants' careless and negligent actions proximately caused financial and economic harm to Plaintiff.

106.     Defendants, and each of them, owed Plaintiff a legal duty of care.

107.     Harm to Plaintiff resulting from the breach of this legal duty of care was reasonably foreseeable.

108.     As a legal result of the foregoing conduct of Defendants, and each of them, Plaintiff has suffered and continues to suffer financial and economic harm including but not limited to loss of the use of the valid Patents through licensing relationships, out of pocket

expenses related to the licensing program, attorneys' fees and costs, and lost profits from the licensing and program which would have continued but for Defendants' wrongful conduct.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief against Defendants, as follows:

1. For compensatory damages, including but not limited to lost profits, licensing revenues, royalties, loss of business reputation, expenses, according to proof, but believed by Plaintiff to be not less than $5,000,000;

2. For Plaintiff's attorneys' fees and costs in defending against the sham reexamination proceedings instigated by Defendants;

3. For a finding that Defendants' conduct has been willful and/or malicious;

4. For punitive and enhanced damages;

5. For Plaintiff's attorneys' fees and costs in prosecuting this action;

6. For such other and further relief as the circumstances and proof at trial warrant.

Dated:   May 8, 2014

Respectfully submitted,

*Andy Tindel w/ permission of Lead Attorney*

Kathryn Lee Boyd
Darcy R. Harris
Jeff D. Neiderman
Kristen Nelson
SCHWARCZ, RIMBERG, BOYD & RADER, LLP
6310 San Vicente Blvd., Suite 360
Los Angeles, CA 90048
(323) 302-9488
lboyd@srbr-law.com
dharris@srbr-law.com
jneiderman@srbr-law.com
knelson@srbr-law.com

ANDY TINDEL
Texas State Bar No. 20054500
MT² LAW GROUP
MANN | TINDEL | THOMPSON
112 East Line Street, Suite 304
Tyler, Texas 75702
Telephone: (903) 596-0900
Facsimile:  (903) 596-0909
Email: atindel@andytindel.com

*Attorneys for Plaintiff Landmark Technology, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 8th day of May, 2014, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

Andy Tindel